**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KEITHIAN LATODD BROWN, 1690061,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:13-CV-5034-N** |
| | ) | |
| **WILLIAM STEPHENS,** | ) | |
| **Director TDCJ-CID,** | ) | |
| **Respondent.** | ) | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the United States Magistrate Judge pursuant to 28 U.S.C.

§ 636(b) and a standing order of reference from the district court.  The Findings, Conclusions and

Recommendation of the Magistrate Judge are as follows:

**I.  Procedural Background**

Petitioner challenges his conviction for possession of a controlled substance with intent to

deliver.  *State of Texas v. Keithian Latodd Brown*, No. F-1051419-Y (7th Crim. Dist. Ct., Dallas

County, Tex., Dec. 16, 2010).  He was sentenced to ninety-nine years in prison.

On May 23, 2012, the Texas Fifth District Court of Appeals affirmed Petitioner's

conviction and sentence.  *Brown v. State*, No. 05-11-00003-CR, 2012 WL 1861115 (Tex. App. –

Dallas 2012, pet. ref'd).  On November 7, 2012, the Court of Criminal Appeals refused

Petitioner's petition for discretionary review.

On August 5, 2013, Petitioner filed a state habeas petition.  *Ex parte Brown*, No. 7,980.

On December 11, 2013, the Court of Criminal Appeals denied the application without written order on the findings of the trial court.

On December 23, 2013, Petitioner filed the instant petition pursuant to 28 U.S.C. § 2254. He argues:

1.      There was no evidence to support the conviction;

2.      There was no evidence to support the deadly weapon finding;

3.      The prosecutor used false evidence and testimony to obtain the conviction; and

4.      He received ineffective assistance of appellate counsel when counsel filed the appellate brief without first obtaining the complete record.

On Jun 9, 2014, Respondent filed his answer.  On June 18, 2012, Petitioner filed a reply. The Court now determines the petition should be granted.

**II.  Factual Background**

The following factual background is taken from the opinion of the Fifth District Court of Appeals.

In November 2009, officers of the Dallas Police Department Street Squad received complaints about the sale of drugs from a specific house and placed the house under covert surveillance.  Also, police tried to infiltrate the house by making a "controlled buy" by sending a confidential informant.  However, the persons inside the house refused to sell drugs to anyone they did not know.  On several occasions during their surveillance, officers observed people approach the back door of the house and rub together what appeared to be two dangling doorbell wires.  On each occasion, the people would then stand in front of the door without knocking.  The door was opened and the people were admitted to the house.  On one occasion, officers observed Brown arrive at the house in an automobile with co-defendant Procella.  Officers saw a female let the pair into the house.  On another occasion, a few people were standing outside the house when Brown arrived by himself in the automobile.  Brown appeared to open the door with a key and let others in.

On January 20, 2010, officers went to the house to execute a search warrant. However, metal bars were affixed to the front door and windows.  Officers loudly yelled

"police," deployed a diversionary device, and rammed the door open.  At that point in time, a shot was fired from inside the house.  Detective Terell McNeal broke down the door and another officer threw a diversionary device inside the house.  Two individuals were found in the house, co-defendant Procella, who was found in the living room, and Brown, who was found in the bedroom.  Brown and Procella were immediately arrested and removed from the house.

In the living room, the officers found a loaded firearm under a couch as well as a spent shell casing on top of one of the couch's cushions close to where Procella had been when the officers entered.  Adjacent to the kitchen was a small closet.  On the outside of the closet, there was a latch and padlock that could be used to safeguard the contents. Inside the closet, the officers found a dozen lighters, glass pipes typically used to smoke crack cocaine, kitchen scrubbing pads (frequently used as a filter to smoke crack cocaine), cigarettes, a small metal lockbox with $208 in cash inside, and small plastic bags of cocaine.  A chemist determined the weight of the small, plastic bags to be 4.9 grams. However, the kitchen did not contain any food, cooking utensils, or napkins.  In the bathroom, there were no toiletries or other indicia that the bathroom was used for its normal purposes.  Instead, the wall behind the bathtub had a hole cut in it, and an officer testified that empty spaces are frequently found in "traps" to conceal narcotics.  Further, the house had no electricity.

Brown was charged with possession with intent to deliver "four or more but less than 200 grams" of cocaine within 1,000 feet of an elementary school, a drug-free zone. He pled not guilty, asserting he knew nothing about the drugs or money and, instead, was using the house for trysts with a paramour.

During trial, Brown called Procella to testify on Brown's behalf.  Procella stated that Brown was never present when Procella sold drugs out of the house.  Procella also stated that he had been "good friends" with Brown for approximately three years. Procella testified he knew there were drugs, money and drug paraphernalia in the kitchen closet.  Procella stated buyers would come to the house and ask to enter by rubbing two doorbell wires together.  Procella admitted to selling approximately $100 worth of crack cocaine from the house daily.  Procella would allow buyers to smoke the purchased crack cocaine in the house, but he stated that Brown was never present during either the sale or consumption of the drugs.  Procella admitted that the firearm found at the scene was his, that he was walking around with it at the time the officers entered the house, and that he shot at the officers.

The jury found Brown guilty as charged in the indictment, and that he used or exhibited a deadly weapon during the offense.  The jury sentenced Brown to ninety-nine years' imprisonment.

*Brown*, 2012 WL 1861115 at *1-2.

**III.  Discussion**

**1.      Standard of Review**

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the

AEDPA), 28 U.S.C. § 2254 provide:

>   (d)      An application for writ of habeas corpus on behalf of a person in custody pursuant
>             to the judgment of a state court shall not be granted with respect to any claim that
>             was adjudicated on the merits in State court proceedings unless the adjudication of
>             the claim –
>
>       (1)      resulted in a decision that was contrary to, or involved an unreasonable
>                 application of, clearly established Federal law, as determined by the
>                 Supreme Court of the United States; or
>
>       (2)      resulted in a decision that was based on an unreasonable determination of
>                 the facts in light of the evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d).  Under the "contrary to" clause, a federal habeas court may grant the

writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the

United States Supreme Court on a question of law or if the state court decides a case differently

from the United States Supreme Court on a set of materially indistinguishable facts.  *Williams v.*

*Taylor*, 529 U.S. 362, 380-84 (2000).  Under the "unreasonable application" clause, a federal

court may grant a writ of habeas corpus if the state court identifies the correct governing legal

principle from the United States Supreme Court's decisions, but unreasonably applies that

principle to the facts of the prisoner's case.  *Id*.

**2.      Sufficiency of the Evidence**

Petitioner argues the evidence was insufficient to support the conviction.  Federal habeas

review of an insufficiency of the evidence claim is extremely limited.  A federal court may not

disturb a conviction in a state criminal proceeding unless no rational trier of fact could have

found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991). The evidence must be viewed in the light most favorable to the verdict. *Jackson*, 443 U.S. 319; *Gibson*, 947 F.2d at 781. Further, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).

In reviewing Petitioner's claims, "federal courts must look to State law for 'the substantive elements of the offense,' but the minimum amount of evidence that the Due Process Clause requires to prove an offense is purely a matter of federal law." *Id*. at 2064 (quoting *Jackson v. Virginia*, 443 U.S. at 324 n.16).

## I.

Petitioner was charged with possession of at least 4 grams but less than 200 grams of cocaine with the intent to deliver, and that during commission of the offense, Petitioner used or exhibited a deadly weapon, or alternatively Petitioner was a party to the offense and knew that a deadly weapon would be used or exhibited. (*See* Clerk's Record at 5.)

Texas law provides that a person commits an offense if the person knowingly possesses cocaine with the intent to deliver. TEX. HEALTH & SAFETY Code Ann. §§ 481.102(3)(D), 481.112(a), (d) (West 2010). The term "possession" means "actual care, custody, control, or management." *Id*. at § 481.002(38). The state must prove Petitioner: (1) exercised actual care, custody, control or management over the cocaine; and (2) knew the substance possessed was cocaine. *See Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006); *Poindexter v. State*,

153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *overruled in part on other grounds*.  Where a petitioner is not in exclusive possession of the premises where contraband is found, the State must also prove the petitioner's connection to the contraband was "more than just fortuitous." *Blackman v. State*, 350 S.W.3d 588, 594 (Tex. Crim. App. 2011) (citing *Poindexter*, 153 S.W.3d at 406).  Mere presence at the location where the contraband was found is insufficient, by itself, to establish possession.  *Evans*, 202 S.W.3d 162.

Alternatively, the State may prove that Petitioner was a party to the offense.  To prove that Petitioner was a party to the offense, the State must prove Petitioner acted to solicit, encourage, direct, aid or attempt to aid another person in the commission of the offense.  TEX. PENAL Code § 7.02(a)(2).

When determining whether sufficient evidence exists to link a defendant to the contraband under Texas law, the state courts consider: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the controlled substance; (4) whether the defendant was under the influence of a controlled substance when arrested; (5) whether the defendant possessed other contraband or controlled substances when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had a right to possess the place where the controlled substance was found; (12) whether the place where the controlled substance was found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*See Evans*, 202 S.W.3d at 162, n.12.  These factors, however, are not a litmus test.  *Id*.  The number of links is less important than the "logical force" or degree to which the links tend to link the defendant to the controlled substance.  *Id*. at 162.

In this case, almost none of the above-listed factors were present.  There were no drugs or drug paraphernalia located in plain view.  Instead, the drugs and drug paraphernalia were located in a closed kitchen closet.  (Trial Tr. Vol. 3 at 55-56.)  Petitioner was not located near the drugs, but was located in the bedroom.  (*Id*. at 81.)  There was no evidence that Petitioner was under the influence of a controlled substance when arrested.  (*Id*. at 82.)  Petitioner did not have any contraband or controlled substance on his person when arrested.  (*Id*.)  Petitioner did not make any incriminating statements and he did not attempt to flee.  (*Id*. at 104.)  There was no odor of a controlled substance in the house.  (*Id*. at 68.)  Petitioner was found with no money on him.  (*Id*. at 84.)  There was no evidence that Petitioner indicated any consciousness of guilt.

The evidence consistent with a link to the drugs was that Petitioner was at the house on the day of raid, and that on one occasion Detective McNeal saw Petitioner use a key to enter the house.

## II.

The state appellate court cited the above factors, but set forth a different list of factors to conclude that Petitioner was affirmatively linked to the drugs.  The court found:

> (1) the police received complaints from an anonymous tipline that drugs were being sold from the house; (2) the door and windows to the house were fortified with metal bars; (3) the house was a "trap" used for the purpose of selling drugs and no one lived in the house; (4) several plastic bags of cocaine were found in the kitchen along with cash and glass pipes for smoking crack cocaine; (5) although Brown was found in a different room than the firearm or drugs, there was no door or wall separating the living room from the bedroom in which he was found; (6) on at least one occasion, it appeared Brown had keys to the house; (7) Brown drove Procella to the house on at least one occasion; (8) Brown

pushed two dangling wires together on the side of the house, as an apparent signal to tell persons inside the house to let him in; (9) there were no cooking utensils or other indicia that the kitchen was used for its normal purposes; (10) there was a hole cut in the wall of the bathroom, which could be used to store or hide items; (11) there were no toiletries or other indicia that the bathroom was used for its normal purposes; (12) Procella admitted to firing a shot at the officers as they were in the process of breaking down the door; (13) Procella admitted to habitually selling and using crack cocaine at the house, generating approximately $100 in gross revenue daily; and (14) Procella testified that he knew Brown for approximately three years prior to the execution of the search warrant.

*Brown*, 2012 WL 1861115 at *4.

The Court will review the factors found by the appellate court. In analyzing the state court's decision, this Court is mindful that it must not engage in "fine-grained factual parsing" of the inferences made by the jury, so long as the jury's inferences are reasonable. *Coleman* at 2064. The Court notes, however, that federal "courts remain empowered to consider, for instance, whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime." *United States v. Vargas-Campos*, 747 F.3d 299, 302 (2014), *cert. denied*, 135 S.Ct. 170 (2014) (citing *United States v. Nevils,* 598 F.3d 1158, 1167 (9th Cir.2010) (en banc)). Additionally, The Court is cognizant that the standard for a due process violation is whether no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson.*

The state court found the following factors established that the evidence sufficiently linked Petitioner to the cocaine so as to prove beyond a reasonable doubt that Petitioner possessed the cocaine, or was a party to the offense.

**(1)     The police received complaints from an anonymous tip line that drugs were being sold from the house.**

Officers McNeal testified police received complaints from an anonymous tip line that drugs were being sold at the house. Detective McNeal testified that Petitioner was seen at the

house in the weeks prior to the raid.  (Trial Tr. Vol. 3 at 35-44.)  McNeal testified, however, that Petitioner was not in exclusive control of the house.  He stated he believed four different people were in control of the house.  (*Id*. at 77.)  These four people included Petitioner, Procella, and unidentified female and an unidentified male.  There was no evidence that Petitioner owned the house, rented the house, or lived at the house.  "When an accused is not in exclusive possession and control of the place where the contraband is found, it cannot be concluded or presumed that the accused had knowledge or control over the contraband unless there are additional independent facts and circumstances connecting or linking the accused to the knowing possession of contraband."  *Allen v. State*, 249 S.W.3d 680, 690 (Tex. App. – Austin, 2008). (citations omitted).  Further, even where a defendant has custody and control of a residence where contraband is found, this is not dispositive of knowledge that narcotics are located in the residence.  *Id*. (citing *United States v. Rojas Alvarez*, 451 F.3d 320, 334 (5th Cir. 2006) and *United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993).  The State was therefore required to show more than Petitioner's presence at the house.

> **(3)      The house was a "trap" used for the purpose of selling drugs and no one lived in the house; (2) the door and windows to the house were fortified with metal bars; (9) there were no cooking utensils or other indicia that the kitchen was used for its normal purposes; (11) there were no toiletries or other indicia that the bathroom was used for its normal purposes.**

The state court found that the house was a "trap" house used for selling drugs, that no one lived in the house, that there were no cooking utensils or other kitchen supplies, and no toiletries in the bathroom, and that the doors and windows to the house were fortified with metal bars.

There was conflicting evidence between the testimony and the photographic evidence as to whether the house was lived in, and what items were found at the house.  Officer McNeal

testified the house had no food, cooking utensils, plates, forks, napkins, or bathroom toiletries,

(Trial Tr. Vol. 3 at 55, 61).  Procella testified that his ex-girlfriend rented the house and allowed

him to stay there after they broke up.  (*Id*. at 225-226.)   He stated he was also stealing electricity

for the house, but admitted he had no clothes at the house.  (*Id*. at 226.)  Photographs of the

kitchen showed pots and pans and at least one plate on the kitchen counter, a kitchen table with a

Hawaiian Fruit Punch box sitting on it, a refrigerator, ice chest, and broom.  (State's Ex. 12, 40)

The living room contained two couches, a television, and a radio/CD player.  (*Id*. at 20, 21.)  The

bathroom photographs appeared to show toiletry items on the bathroom counter and on the back

of the toilet.  (*Id*. at 31, 44.)  Photographs of the bedroom showed it contained a bed with

bedding and blankets, a chair, and a bicycle.  (*Id*. at 27.)  Outside the house was a trash can.  (*Id*.

at 45.)

    Although the photographic evidence conflicted with Detective McNeal's description of

the items in the house, all inferences must be construed in favor of the verdict.  The Court

therefore finds the jury could have determined that the house was a trap house.

    To the extent the jury or state court found that Petitioner could be linked to the drugs

because he either knew or should have known that the house was a trap house, and that a trap

house would contain drugs, this factor fails to establish beyond a reasonable doubt that Petitioner

had knowledge of the drugs found in the kitchen closet, that he exercised care, custody or control

of the drugs, or that he aided, encouraged or attempted to aid Procella in possessing and

distributing the drugs.  "It must be remembered that one is not a party to a joint possession just

because she was present and had knowledge of an offense by another.  A defendant's knowledge

of the presence of contraband is insufficient to establish the requisite mental state knowledge of his or her possession of the drugs." *Allen*, 249 S.W.3d at 691 (citing *Oaks v. State*, 642 S.W.2d 174, 177-78 (Tex. Crim. App. 1982)); *see also Lassaint v. State*, 79 S.W.3d 736, 746 (Tex. App. – Houston, 2002) ("possession means more than being where the action is, it involves dominion and control over the thing allegedly possessed.")

> **(4)     Several plastic bags of cocaine were found in the kitchen along with cash and glass pipes for smoking crack cocaine.**

The state court found that several bags of cocaine, cash and glass pipes were found in the kitchen closet. Officer Kaiser testified the door to the kitchen closet was closed. (Trial Tr. Vol. 3 at 175-77.) Further, a photograph of the kitchen closet showed that it had a padlock. (State's Ex. 15.) There was no evidence at trial regarding whether the closet was unlocked at the time of the raid. It is uncontroverted, however, that the drugs and drug paraphernalia were not in plain view at the time of the raid.

> **(5)     Although Brown was found in a different room than the firearm or drugs, there was no door or wall separating the living room from the bedroom in which he was found.**

The state court found that although the drugs were found in the kitchen, and the firearm was found next to Procella in the living room, there was no door between the living room and the bedroom. It remains uncontroverted that the Petitioner was in the bedroom and the drugs were in a closed kitchen closet.

> **(6)     On at least one occasion, it appeared Brown had keys to the house.**

The state court found that, on at least one occasion, Petitioner had a key to the house. As discussed above, Detective McNeal testified that Petitioner was not in exclusive possession of

the house.  (Trial Tr. Vol. 3 at 77.)  Further, Officer McNeal testified that officers never witnessed a drug sale at the house, and that there was no evidence that Petitioner had used drugs at the house.  (*Id*. at 74, 86, 90.)

Detective McNeal did testify that numerous people came to the house during the surveillance and that this was indicative of a drug location.  He stated that some people came to the house and stayed only a few minutes.  He stated it was a common in drug sales for people to stay just a few minutes if they were buying drugs at the house.  (*Id*. at 87.)  He also stated that it was common for some drug buyers to stay at a house more than a few minutes so they could smoke the drugs they had bought.  (*Id*.)  Therefore, Officer McNeal testified that if individuals stayed at the house just a few minutes, this was indicative of drug sales, and that if individuals stayed at the house for any length of time, this was also indicative of drug sales since they were smoking the drug at the location.

Officer McNeal testified that during the weeks prior to the raid, he saw Petitioner at the house and that Petitioner allowed people in and out of the house.  (*Id*. at 88.)  Officer McNeal testified, and showed video evidence, that on one occasion Petitioner arrived at the house and appeared to use  a key to open the door and let two men into the house.  (*Id*. at 36.)  Officer McNeal did not testify regarding how long the two men stayed.  The video ended approximately twelve minutes after the two men entered the house, and it did not appear that anyone left the house during that time.  (State's Ex. 47.)

Officer McNeal also testified that on one occasion he saw Petitioner and Procella drive up to the house.  McNeal stated that a female let Petitioner and Procella into the house.  (*Id*. at 37.)

Once they were allowed into the house, three people exited the house and waited on the porch. Another man also walked up to the porch. A video regarding this incident was played for the jury. In that video, four people plus Procella are standing on the front porch. After a few minutes, all the people are let into the house. The video ends without anyone leaving the house. (State's Ex. 46.)

In the last video played for the jury, a man walks up to the house and rings the doorbell by pressing the two wires together that were located on the side of the house. (Trial Tr. Vol. 3 at 39.) He is allowed into the house and stays about two minutes before leaving. Another man also walks up to the house and rings the doorbell by using the two wires. He is allowed into the house. The video plays for about eight minutes and the man does not leave the house during that time. (State's Ex. 46.)

Although Officer McNeal surmised that the activity at the house was consistent with drug sales, officers never witnessed anyone selling or using drugs at the location. Officers never identified any of the people whom they believed were buying drugs, and they submitted no evidence that any of these people had ingested drugs or had purchased drugs.[1] Officer McNeal testified there was no audio or video of a person purchasing drugs from this location. (Trial Tr. Vol. 3 at 86.) In response to defense counsel's question that, "You have no person that went in there [the house], and that you know that purchased drugs there, right?" Detective McNeal answered, "Correct." *Id*. Further, there was no evidence, beyond conjecture, that Petitioner was

---

[1]Officer McNeal stated officers arrested one person leaving this location. Defense counsel objected and the objection was sustained. No evidence was submitted regarding this arrest or the person arrested. (Trial Tr. Vol. 3 at 85.)

ever present during a drug sale or drug use, or that Petitioner aided or encouraged Procella in the sale of any drugs. On cross-examination Detective McNeal admitted that although he believed the people going to the house during the surveillance were buying drugs, they "could have been going there for anything." (*Id*. at 80.) Procella also testified that Petitioner was never present during drug sales or use. (*Id*. at 227.) Although the jury could have disregarded Procella's testimony, the State has failed to submit evidence to establish beyond a reasonable doubt that Petitioner had possession of the drugs or acted as party to the offense. *See Lassaint*, 79 S.W.3d at 741 ("proof amounting to a strong suspicion or even a probability will not suffice.").

      **(7)    Brown drove Procella to the house on at least one occasion.**

The state court stated Petitioner drove Procella to the house on at least one occasion. This fact fails to link Petitioner to the cocaine found in the kitchen closet on the day of the raid.

      **(8)    Brown pushed two dangling wires together on the side of the house, as an apparent signal to tell persons inside the house to let him in.**

The state court found that Petitioner pushed two wires together on the side of the house to signal people inside the house to let him in. Officer McNeal and Procella both testified that the wires outside the house operated the doorbell. (Trial Tr. Vol. 3 at 52, 228.) This evidence does not link Petitioner to the cocaine in the kitchen closet.

      **(10)   There was a hole cut in the wall of the bathroom, which could be used to store or hide items.**

Officer McNeal testified there was a cut out in the wall behind the bathtub. (*Id*. at 60.) McNeal stated the cut out could be used to hide narcotics. (*Id*. at 61.) Officer McNeal's testimony, as well as photographs of the cut out, showed that an individual would have to lift up

a cover to find the cut out.  (*Id.* at 61; State's Ex 42 -43.)  There was no evidence that Petitioner

had knowledge of this cut out.  No contraband was found in the cut out, and no evidence was

submitted showing this cut out was ever used to conceal narcotics.

> **(12)   Procella admitted to firing a shot at the officers as they were in the process of breaking down the door.**

At trial, Procella admitted to firing a shot at officers as they raided the house.  Procella

testified that Petitioner did not know he had a gun, and that on the day of the raid, Procella at

various times carried the gun with him, and hid the gun under his clothes, under his leg and under

the couch.  (Trial Tr. Vol. 3 at 230-232.)  The jury could have disregarded Procella testimony,

but the fact that Procella fired a gun at police does not link Petitioner to drugs, establish any

evidence of Petitioner's possession of the drugs or establish that Petitioner was a party to the

offense.

> **(13)   Procella admitted to habitually selling and using crack cocaine at the house, generating approximately $100 in gross revenue daily.**

Procella testified that he made $50 to $100 per day from selling cocaine at the location.

(*Id.* at 223.)  He also testified that the drugs, drug paraphernalia and firearm belonged to him and

that Petitioner had no knowledge of these items.  (*Id.* at 219-222, 232.)  Procella stated that

Petitioner was never present at the house when he sold drugs.  (*Id.* at 227, 229.)

The jury was free to disregarded Procella's testimony.  The State, however, was required

to submit evidence that proved beyond a reasonable doubt that Petitioner possessed the cocaine,

or that he aided or encouraged Procella to possess and deliver the cocaine.  Further, although

Officer Junker testified that drug houses often have someone assisting the sales by acting as a

look out, or a guard, or by using walkie talkies, (*Id*. at 193-94), there was no evidence submitted that Petitioner assisted Procella in any way to sell drugs.

> **(14)    Procella testified that he knew Brown for approximately three years prior to execution of the search warrant.**

Procella testified that he had known Petitioner for approximately three years prior to the execution of the search warrant.  This factor fails to link Petitioner to the drugs.

III.

Although not discussed by the state court, the prosecution also admitted copies  of Petitioner's jail phone calls.  (State's Ex. 55.)  The prosecutor played a portion of one call between Petitioner and his mother relating to "cutting up."  (Trial Tr. Vol. 3 at 241.)  After the call was played, Detective Junker testified that "cutting up" can refer to cutting drugs into smaller amounts for the purpose of selling the drug.  (*Id*. at 243-44.)

The record does not reflect which phone call the State played for the jury.  The Court has reviewed the phone calls and has located one call on February 27, 2010, between Petitioner and his mother that, towards the end of the call, mentions cutting up.  In the call, Petitioner states he told his attorney that Procella "was cutting up" and had a glove on.

The phone call does not specify whether Petitioner saw Procella cutting up, or whether Procella simply told Petitioner he was cutting up.  The call also did not state when Procella was cutting up.  At the time of the raid, there were no drugs or drug paraphernalia in plain view. Drugs were found only in the kitchen closet.

The Court construes the statements in the light most favorable to the verdict to find that Petitioner's statements meant that Petitioner saw Procella cutting drugs up on the day of the raid.

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge**          Page -16-

The phone call statements, however, did not state that Petitioner assisted Procella with cutting up, or assisted Procella with the drugs in any manner.  The phone calls contained no evidence that the drugs belonged to Petitioner, or that he exercised care, custody or control of the drugs. Mere presence does not make an accused a party to joint possession even if the accused knows of the existence of the contraband and has knowledge of an offense. *See Oaks v. State,* 642 S.W.2d 174, 177 (Tex.Crim.App.1982) (possession means more than being where the action is); *Lassaint,* 79 S.W.3d at 746; *Allen*, 249 S.W.3d at 697 ("Mere presence of an accused at the place where contraband is being possessed or used by others, and even the accused's knowledge of an offense by others, does not constitute joint possession of the contraband.") (citations omitted).

IV.

The Due Process Clause of the Fourteenth Amendment forbids a conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *Jackson*, 443 U.S. at 315 (1979).  Under *Jackson*, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19.

Notwithstanding this deferential standard, the Fifth Circuit instructs the Court to "consider the countervailing evidence as well as the evidence that supports the verdict" and credit "only reasonable inferences from the evidence[.] " *See United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (The Court "cannot 'credit inferences within the realm of possibility when those inferences are unreasonable[.]' ") (citations omitted).  The verdict cannot

be based "on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Moreland*, 665 F.3d at 149 (quoting *United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006)); *see also Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013) ("[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions."). Where a petitioner makes the required showing, due process requires that the writ be granted. *See Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008) (finding evidence insufficient and granting § 2254 petition)*; see also Donahue v. Cain*, 231 F.3d 1000 (5th Cir. 2000) (same).

The Court finds that no rational trier of fact could have found the essential elements of the crime of possession with intent to deliver four grams or more but less than 200 grams of cocaine, or that Petitioner was a party to the offense, beyond a reasonable doubt.[2] The Court has construed all evidence and inferences in the light most favorable to the verdict, and has considered the evidence individually and collectively. The Court finds that in regards to the surveillance leading up to the raid, the State offered only mere speculation that any cocaine was being sold or used when Petitioner was present at the house. The State established no proof beyond a reasonable doubt that when Petitioner was present at the house, Petitioner possessed cocaine, was selling or was a party to possession and distribution of cocaine, and that the amount of cocaine was at least 4 grams as charged in the indictment. As discussed above, Officer

---

[2]Because the Court finds the State failed to prove the elements of possession with intent to deliver, or that Petitioner was a party to the offense, the Court does not reach the issue of the deadly weapon finding. The deadly weapon finding required that Petitioner be convicted of possession with intent to deliver. (Clerk's Record 32-33.)

McNeal admitted that officers never witnessed any person buying, selling, or using drugs at the house.  Officer McNeal admitted there was no evidence that Petitioner had used drugs.

Additionally, on the date of the raid, the State failed to prove beyond a reasonable doubt that Petitioner possessed the cocaine in the kitchen closet, or that Petitioner aided, encouraged or attempted to aid Procella in the possession and distribution of the cocaine.  As discussed above, the officers testified that at the time of the raid, the drugs were in the kitchen closet, and no drugs or drug paraphernalia were in plain view.  In the recorded jail phone calls, Petitioner stated the cocaine belonged to Procella, and that Procella was cutting up.  There was no evidence that Petitioner was cutting up or assisting in the cutting up, or that Petitioner was aiding Procella as a look out, or aiding in any other way.  There was also no evidence that on the day of the raid Petitioner exercised care, custody or control of the cocaine.

## IV.  Summary

The Court finds that viewing all evidence in the light most favorable to the verdict, no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. The Court finds that the state court's decision to deny relief was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Because the Court finds Petitioner is entitled to relief on his insufficiency of the evidence claim, the Court declines to address Petitioner's remaining claims.

## V.  Recommendation

For the foregoing reasons, the undersigned Magistrate Judge recommends that the District Court grant the petition for habeas corpus relief brought pursuant to 28 U.S.C. § 2254 and nullify

the conviction.  *See Donahue*, 231 F.3d at 1005 ("when a conviction is reversed for insufficient evidence the Double Jeopardy Clause bars a state from conducting a retrial on the same charge.") (citing *Burks v. United States*, 437 U.S. 1 (1978)).  The Court should issue a writ of habeas corpus and direct William Stephens, Director of TDCJ-CID, to release Petitioner from custody imposed in trial court Cause No. F-1051419-Y, in the 7th Criminal District Court of Dallas County, Texas within sixty days of the date these findings, conclusions and recommendation are adopted by the District Judge.

Signed this 24th  day of March,  2016.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO OBJECT**

A copy of this report and recommendation shall be served on all parties in the manner

provided by law.  Any party who objects to any part of this report and recommendation must file

specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. §

636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific

finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's report and recommendation where the disputed

determination is found.  An objection that merely incorporates by reference or refers to the

briefing before the magistrate judge is not specific.  Failure to file specific written objections will

bar the aggrieved party from appealing the factual findings and legal conclusions of the

magistrate judge that are accepted or adopted by the district court, except upon grounds of plain

error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).